80 So.2d 424

Mrs. Sadie TUGENDHAFT, wife of Louis J. Gehbauer, Jr., M.D.

v.

Louis J. GEHBAUER, Jr., M.D.

No. 41578.

March 21, 1955.

Rehearing Denied April 25, 1955.

George Kambur, Clarence Dowling, John Yuratich, New Orleans, for appellant.

Edgar Corey, Beuker Amann, New Orleans, for defendant-appellee.

SIMON, Justice.

Mrs. Sadie Tugendhaft is appealing from a judgment of the district court rejecting her demand for a separation from bed and board on the ground of abandonment and granting to her husband, Dr. Louis J. Gehbauer, Jr., based on his reconventional demand, a separation from bed and board on the ground of cruel treatment.

The defendant admitted the abandonment, contending that he left the matrimonial domicile for just and legal cause. Assuming the position of plaintiff in reconvention, he alleges specific acts of cruelty toward him by plaintiff, entitling him to judgment decreeing a separation from bed and board.

On April 23, 1953, plaintiff filed an answer to defendant's original and supplemental reconventional demand, in which she denies the acts of cruelty charged to her and alleges that a romantic affair between her husband and a woman therein named was the sole cause of their separation. We observe that she therein again prays for judgment on no other ground than that of abandonment, as originally prayed for.

The trial judge rejected plaintiff's demand and sustained the position of the defendant, granting him a judgment as prayed for by him. Written reasons were rendered in support of his decree, and they reflect a careful inquiry and analysis of all of the evidence submitted.

We do not find it necessary to enter into a detailed narration of the evidence contained in the record. It clearly appears, and which defendant urges as a just and legal cause for his abandonment of the matrimonial domicile, that practically all of the difficulties, quarrels, fits of anger and epithets, between these parties were precipitated by matters (1) involving finances, the extravagances indulged in by plaintiff and her seeming utter disregard for money or financial obligations; (2) her complete lack of interest or concern in her home and marital responsibilities; and (3) her alleged behavior and indiscretions, which undoubtedly culminated in the present incompatibility of these parties.

It appears that the defendant is a medical doctor, 60 years of age, and who enjoys an average moderate income from that source. The plaintiff is a 36-year-old qualified medical technician, and their marriage on May 17, 1943, was the outgrowth of their mutual professional and personal interests. There were no children born of this union. Their matrimonial domicile was established and has since remained in the Parish of Orleans. They purchased, on credit, a modern comfortable home at 2732 Odin Street, in the City of New Orleans. Plaintiff's mother and defendant's father lived with them, the mother attending to most of the household duties and the preparation of meals. Defendant's father, due to his age, is unemployed, but seemingly aided in odds and ends in and

around the household. Plaintiff's full-grown and able-bodied brother had his three daily meals at the house, without charge or contribution on his part.

It appears that plaintiff was regularly employed as a medical technician by a Doctor Tripoli from 1939 to the latter part of 1951, and thereafter assumed similar duties with her husband, serving as such until their separation on January 4, 1953. While working with her husband she received no salary or wages, but helped herself, whenever she desired, to currency in his wallet, monies collected from patients, and through checks signed by him payable to her or "cash". That she was fully compensated in lieu of a salary is irrefutably shown. Defendant provided plaintiff the sum of $100 a week for household expenses, including .food, household necessities and incidentals. All public utility bills were paid for by him.

Plaintiff had a seemingly unlimited charge account in practically every department and jewelry store and exclusive ladies' ready-to-wear establishment in this city. Her testimony reveals that she sought to maintain a position and style of living which she decided the wife of a medical doctor should be able to maintain, irrespective of his pressing financial obligations. In spite of his constant remonstrances, she continued the life of extravagance, indifferent to a day of reckoning or discharge of his responsibilities. She is shown to have made extravagant purchases to satisfy her every whim, fancy and changing style or mood, and at prices beyond the realm of thrift. Many of these purchases she described as her personal gifts: one for her favorite bartender, another for her male beautician, expensive clothing for her able-bodied brother who was voluntarily unemployed and a free boarder and lodger at their home, as well as many other gifts for her personal friends. All of these were charged, as usual, to defendant's open account and in a two-year period aggregated the sum of approximately $10,000.

It is also shown that plaintiff had for several years past shown complete indifference to her marital obligations and wifely duties. It is true that her hours of employment usually ended at 5:00 p. m. each weekday, except Saturdays, but it was on rare occasions that she would return home each night earlier than 9 or 10 o'clock, and in many instances at early morning hours, finding her husband, who had had his evening meal alone or with his father, at home. She refused any explanation of her absences, other than she had been "out with friends". This pattern of home life was persisted in by her in spite of her husband's expressed wishes and remonstrances.

It also appears that from the early summer of 1952 until the date of their separa-

tion, the plaintiff, usually accompanied by her unmarried lady friend, motored to Biloxi each weekend, usually driving over on Friday evenings and returning on Sunday nights, and occasionally on Monday mornings. These weekly visits were admittedly spent in the company of male and female friends, visiting night spots, and dancing and indulging in alcoholic beverages. Though her husband repeatedly complained of this conduct, she did not deign to heed his admonitions or explain these constant visits, finally reaching a stage where she would leave without a word to him of her departure.

It is most significant that plaintiff, during these weekend visits, developed an interest in and attachment for a young soldier, Sergeant Fred Kulibert, stationed at Keesler Field, near Biloxi, Mississippi. It is shown that he accompanied her in her quest for pleasure; that many long-distance telephone calls were made by her to him, too numerous to detail, all charged to her husband; that she purchased gifts, charged them to her husband, and forwarded them to Kulibert's parents in Wyoming.

In furtherance of their relations, it is shown that she assisted in arranging for her soldier friend the purchase of a Plymouth automobile on terms of credit; that she signed as a co-maker with him a note for $2,000 in favor of an automobile credit agency to cover the purchase price. She did not inform her husband or even intimate to him her part in this transaction. The defendant learned of what had occurred a few weeks before the separation when he received an insurance policy covering the automobile in question, addressed to the named soldier at defendant's residence address. In the policy the defendant's relationship to the soldier was designated as that of "uncle", whereas in truth and in fact no such relationship existed.

In an effort to controvert all of the facts as detailed, plaintiff testified that whatever she did was done in aid of her girl friend's friendship with the named soldier. We are unimpressed with her representation that her conduct was innocent and free from suspicion.

These cumulative acts of plaintiff's conduct and behavior were the precipitating causes of the quarrels between the parties, the constant nagging by the wife, and the use by her of insulting, abusive and profane language complained of by defendant.

Article 138 of the LSA–Civil Code recites the several causes for which a separation from bed and board may be obtained, paragraph 3 of which reads as follows:

"On account of * * * excesses, cruel treatment, or outrages of one of them towards the other, if * * * such ill-treatment is of such a nature as to render their living together insupportable; * * *." (Italics ours.)

We must conclude, as did the trial judge, that the indulgences and extravagances of the plaintiff, her neglect and utter disregard of her domestic duties and marital responsibilities, her indiscretions with others, her nagging, quarreling and fault-finding, accompanied by her use of insulting and profane language towards her husband and his deceased mother, when taken as a whole, lead us to no other conclusion than that they resulted in a disruption of defendant's peace of mind, in mental harassment and humiliation, or, as we have said, the " 'very refinement of cruelty' ", so as to render their living together insupportable within the meaning and contemplation of our codal article, supra. Vicknair v. Terracina, 164 La. 117, 113 So. 787, 788; Adranga v. Tardo, 189 La. 678, 180 So. 484; Temperance v. Herrmann, 191 La. 696, 186 So. 73; Moore v. Moore, 192 La. 289, 187 So. 670.

In arriving at his conclusions, the trial judge correctly disregarded evidence relative to an alleged romantic affair between the defendant and a woman friend of the family, as charged by plaintiff, even though he is eminently justified in concluding that the proof thereof was woefully wanting.

For the reasons assigned, the judgment of the lower court is affirmed, appellant to pay all costs.